All right. These two cases are on the calendar separately, but they're really the same issue, so we'll take the arguments together. Very well, Your Honor. Good morning. May it please the Court? My name is Steve Katzman. I'm with Bienert Miller & Katzman, and I represent the appellants here. We are asking the Court to reverse the district court's reversal of the bankruptcy court's order to granting summary judgment in favor of our clients. And as we commence this oral argument on what some might consider a fairly dry area of the law, the application of the provisions of the Bankruptcy Code on the effect and the pursuit of fraudulent transfer claims, the question here is, what's in a name? The litigation trustee will argue everything's in a name, and the account from which the funds were transferred is the same as the debtor. The liability to my clients is absolute. Mr. Katzman. Yes, Your Honor. It's not dry. It's not a dry area of the law, but I think that, you know, given that I'm sitting with Judge Yashima, it might be a well-settled area of the law. Are you asking us to change, to cut to the chase, are you asking us to change from the Dominion test to some one-step transaction approach? Yes, I'm very familiar with the mortgage store case that Judge Tashima authored. In answer to your question, if the Court is going to apply the Dominion test in the way the litigation trust is asking, then, yes, we would be asking for a change to the control test, because the control test would give this Court the tools to look at this practically. But you don't have to do that, and the Dominion test is consistent with mortgage store. Mortgage store dealt with an entity that had clearly, and the argument was in Hawaii, and I listened to the oral argument and listened to the positions articulated, and the arguments there were about a sale of a piece of real estate where the money was going to the purchaser and the intermediary had no discretion on what to do with the funds. And also the other distinguishing fact is the recipient was represented by counsel. Very different facts here. But is your argument then that even under the Dominion test, you know, really then it boils down to who the initial transferees were? Yes, Your Honor. Who are the initial transferees in this case? The initial transferees are the bellows, because they secreted the funds from Wall Design and put it into a secret account that was hidden by the debtor. And then the first of the transferees was established by the debtor, put his wife, used his personal address, put his wife on as a co-signatory who was not an employee of Wall Design, and caused these rebates and credits that should have gone to Wall Design that was property of Wall Design to be diverted. This is a complex mechanism, and diverted for uses wholly unrelated to Wall Design. And it was done extensively for, the incompetent test talks about Dominion, and Dominion says, do you have the ability to use the funds as you see fit? That's the Dominion test, essentially. It was recited by Judge Tashima in Mortgage Store. And it talks about, could you use the money to invest in uranium or buy lottery tickets? Well, the evidence here is that you could. It shows Bellow could do that and did do that. He spent the money on whatever he chose to do. If that's not Dominion, I'm not sure what is. And the fact is, is that there isn't a strict liability test on Dominion. And if you imparted a strict liability test, you'd be doing injustice not just to my clients, but to the Code. Because the Code, if you look at the Code, the Code defines transfer very clearly. It defines that transfer can still exist even without a change in title, without a change in legal title. Now, the Code doesn't define transferee, but common sense. And the Webster's Dictionary says, well, transferee is someone who receives a transfer. Well, because of the inequitable fact that it was set up secretly by the husband, you're saying, isn't dispositive to the argument because the initial transfer was still to his account, on which his wife was also the owner. Yes, it's, well, it's, I would submit to the court that while IncomNet and Mortgage Store says legal title strongly correlates with Dominion, it doesn't always correlate with Dominion. And here it didn't. In Enri's video, doesn't that kind of put this issue to rest? Because that's, they hold that people in the Bellows position are not the initial transferee. That court basically says that the fact that you have power to direct the allocation of the resources do not amount to legal Dominion and control. So that would make your clients the initial transferees, not the Bellows. It would, Your Honor, if in the facts of the video there was a person in the Bellows position who was the initial transferee, he took the purchase of a cashier's check. And the Ninth Circuit in the video said that the principal was merely a courier. That's what he said. He said he's not a transferee, he's a courier. He took the cashier's check, couldn't do really anything else with cashier's check but remit it because it's payable to the casino, and paid the casino. That's not what happened here. It's very factually distinguishable because here the money actually went to Mr. Bellow, nominally in the name of wall design, but to Mr. Bellow as the suspended. The money went to wall design. That's the account. They paid wall design for wall design invoice or whatever. It was not in to the personal account of the Bellows, even though they, you know, it was a secret account and they exercised control over the account. It's no different from a corporate insider who might have the corporate authority to get the money. To exercise that kind of control over funds deposited in the corporation, right? I have to respectfully disagree. And the reason why I respectfully disagree is actually illustrated in our reply brief, responding to their hypothetical with General Motors. They said General Motors bookkeeper takes the money and that, therefore, makes them the under author initial transferee. No. What if the bookkeeper sets up an account nominally in the name of General Motors and diverts the money as she sees fit? At that point, and that's the fundamental distinction here, at that point she became the initial transferee. Well, here you've also got the fact that the account was actually opened up using his home address with the wife as a signatory when she wasn't an employee of the company. So doesn't that move it away from Video Depot where somebody who's not even an employee of the company is now an employee of the company? Absolutely. Absolutely. It is a fundamental and critical fact that it shows, even if it's nominally in the name of wall design, it is in the control, the dominion, I should say, the dominion to be spent on lottery tickets, uranium mines, or in the instances here on lavish goods, on other things, and frankly on buying the only asset my client had to really for their retirement, this real estate. He used the money, the bellows used the money as they saw fit, and they hid it by the liquidation trustee's own admission, hid it from wall design. How long was this going on? Years. It was going on for years. And the other thing I want to touch upon, because I do have limited time, is good faith. There is nothing that my clients could have done to know about the voidability of the transfer. The only fact that they rely upon to support that the money was, that they should have been on inquiry notice, was that the money was coming from wall design. Well, that alone is insufficient. The bankruptcy court found that. Findings are reviewed for clear error. But moreover, there's a Sixth Circuit case actually that we cited in our papers that say that's not enough. So when you consider that, consider that, that they were acting in good faith, receiving this money, providing value, and that there was a two-step transaction here. It wasn't like video, which was just a cashier's check. It wasn't like mortgage store where the intermediary could not do anything with the money other than pay mano. It was complete dominion by the bellows. You know, Mr. Kessman, you keep ignoring the one factor that in common that includes as part of the dominion test, and that's legal title to the funds. No, it didn't have legal title to that checking account, did he? Yes, Your Honor. That's an incumbent, right? It is incumbent, but it says strongly correlates. It doesn't say always correlates. And if I'm ignoring it, I apologize. I didn't mean to ignore it. We deal with that head on. In the vast majority of cases, legal title can be consistent with dominion. But in this case, and this is where it's different from all the cases that we've discussed, it's more in line, frankly, with deets and dominion, which, ironically, dominion was also decided at the time and cites to the dominion test. It's more in line with those cases where the transfers were to the principal, and the courts found that that was the first transfer. In Video Depot, just to clean up the record, didn't we consider the Sixth Circuit case and basically reject it? The court considered the, and I won't specifically recall, I do know that Sixth Circuit applies the control, the hybrid test, and I do know the Ninth Circuit has rejected that test. I think that, again, if we were going to, if we were going to, if we were going to reject that test, we would have to go back to the Ninth Circuit. So all these tests are judicially created to avoid inequitable results, control, dominion. It's all about the fact that the code, if you look at the code and you use a common-sense interpretation, the intermediary can in all cases be subject to avoidance as the initial transferee. So they created, through Incomnet, the conduit test, which is also part of the dominion test. And that was, you know, that allocates the monitoring costs and risks of repayment among the parties. That's what Congress intended. And so under this scenario, actually we had three parties. Now the creditors committee would have three entities to go after, right? And the other two entities, other than the Bellows, would be easier to recoup the funds from than perhaps the Bellows. Not true, Your Honor, because they did go after the Bellows and they did recoup funds, including the real estate that my client sold to Mr. Bellows. So they were able to do that. And the fact that there's an intermediary who is liable, that's the difference here. We don't have an innocent intermediary. We have a culpable intermediary who diverted, controlled and exercised dominion over those funds. And just because it happened to be in Waldesein's name doesn't mean he didn't have dominion. This is where the cases can be harmonized. This is where it's consistent. And this is where the court should find that the bankruptcy court was right, that the bankruptcy court found that my clients were subsequent transferees. They acted in good faith. And Andrew, to sum up your judgment in our favor, I'd like to reserve the balance of my time for rebuttal if I can. Sure. Thank you. Good morning, Your Honors. May it please the Court, John Reitman appearing for Brian Weiss, the trust which was created pursuant to the plan of reorganization in the Waldesein bankruptcy case. And Mr. Weiss succeeded to the claim as trustee that's now before the Court. So why aren't the Bellows the initial transferees in this case? If you used a totally different test, they might be. But under the dominion test, they are not. This account was opened at Preferred Bank in the name of Waldesein. They used Waldesein's tax ID number. They used a statement by domestic stock organization for Waldesein. They used Waldesein's articles of incorporation. They had a unanimous consent of shareholder of Waldesein to corporate action to open that account. And they had a signature card signed by Mr. Bellow originally as an officer of Waldesein. Mr. Bellow, in fact, was the president, chief executive officer, sole director, and sole shareholder of Waldesein. In this case, applying the dominion test, I don't know, you could argue it's almost putting form over substance and it leads to a very inequitable result, doesn't it? Well, it's always the case in these circumstances that someone gets hurt. Either the creditors of the corporation get hurt or the people who get the transfers from the corporation get hurt. Congress addressed that in enacting Section 550 of the Bankruptcy Code. It says who we're going to look at, how we're going to allocate this is the initial transferee and the person for whose benefit. So the idea of allocating risk and figuring out the responsibility on the initial or putting the burden on the initial transferee is that that person, having received the direct transfer, is really in the best position to monitor, right? So why isn't that Mrs. Bellow in this case? She is not an employee of the company, as I understand it. She signed the sham account's signatory card, giving her access to the account. Shouldn't she wonder why she's on an account that's just nominally in her husband's business? And wasn't she the one in the best position to monitor? I think the answer to that is no, Your Honor. Why not? Well, she's in there with Mr. Bellow. She knows, presumably, what Mr. Bellow does. She's aware that this is his company. She's aware there might be circumstances where she might be asked to write a check for the company. We don't know what actually went between them. We don't know what he told her, what she said in response. But it's often the case that you have corporate accounts where a non-officer of the corporation is a signatory, and sometimes they aren't even employees. I've seen numerous accounts where an accountant for a company has the right to draw checks on an account. I've seen numerous instances where an independent bookkeeper does that. Mr. Reitman, aren't the Henrys and the Burrishes sort of like a holder in due course? They took without notice, they had nothing to do with the fraud, and yet they have been the ones who are strapped. And certainly the cases which go the other way still do honor to congressional intent, but they do what sounds almost logical. The initial transferee is the first transferee. And in this case, the Bellows were the first persons to get those ill-gotten monies. And they were the ones who knew that they were ill-gotten monies. Your Honor, they weren't ill-gotten monies. Mr. Bellow's position. You're correct. They were just used to achieve ill-gotten gains. Well, Mr. Bellow's position would be, because he took it, he said, oh, this was, when I spent this money, it was my income. The problem with that argument, of course, until he spent the money, it wasn't his income. The problem with that argument was, we called it a secret account for a reason. There were two people he really wasn't telling, the Internal Revenue Service or the Franchise Tax Board in California. Now, when you get payroll, that's taxable to the entity. So what Mr. Bellow was doing was avoiding the taxable consequence to wall design. But we all understand that Mr. Bellow was doing bad things with the money. The point is that Henry and Burrish had no notice. They had nothing to do with the fraud, yet they're being put in the same boat of culpability as is, as are the Bellows. Your Honor, it's not a culpability issue. It's Congress's intent to do something, and it's this circuit's decision that it should adopt a dominion tax. And it's a good reason to do that, because then you go forever trying to figure out who the transferee is. Now, Mr. Katzmann tries to equate transfer, which has a broad definition in the Code, with transferee, which is not defined in the Code. And that was left to courts to decide. And interestingly enough, if we go to your circuit, Your Honor, well, you call it the dominion and control test. In fact, it is the dominion test, and that's been adopted by your circuit as well. Here, Burrish and Phillips and Mrs. Henry did the same thing. They do a deal with Mr. Bellow, and they start getting checks. From a company called Wall Design. Now, their arguments have been, we didn't know Wall Design from a hot rock. Okay, if that's the case, why do you take a check from someone you don't know? Does that put you on notice? Well, it puts you on notice of something, which is, why am I getting paid by someone other than the person to whom I've sold real property, and I know who I've sold it to, because I've signed a grant deed, and I got a deed of trust back, and it sure as heck doesn't say Wall Design. Or, if you're Mrs. Henry, you're providing services to an unidentified place, but it's certainly not Wall Design, because she never made that claim. Does the record reflect that neither Burrish nor Henry knew that Wall Design existed? That the Bellows ran the company Wall Design? I think as to Burrish and Phillips, I don't think there's anything there. As to Mrs. Henry, the argument was, well, she had performed services for Wall Design before, but she certainly knew in this circumstance that she was not providing services to Wall Design. And she gets a check from it. You ask the question, why am I getting this from someone other than you, and why don't you just simply write me the check, and then I'm much more comfortable? How difficult is that? Really? It's not a problem. It's simple to do. I acknowledge that people all the time don't do that, but they've done that because people sometimes are a little more trusting than they should be, or they view it as just part of their economic risk in doing business. It's just like the Hilton Hotel in Video Depot. Are you telling us, then, that if we go back to the commercial paper analogy, and Burrish, Phillips and Henry take as holders in due course, their defense would not be good because they got a check from a company called Wall Design, even though they may have been in privative contract with Bellow personally? That's correct, Your Honor. They're not holders in due course. Because the holder in due course under the commercial code doesn't replace fraudulent transfer claims. Nothing in fraudulent transfer law that says that's the case. I've certainly never seen it. Thank you, Counsel. Unless there are any questions, is there anything additional that you'd like to add? No, I don't have any other questions, Your Honor. I would like to make a point because Counsel made it in his papers. He said that the knowledge that Mr. Bellow had about this account isn't imputed to Wall Design, even though the knowledge of an officer is imputed to the corporation because Mr. Bellow was acting adverse to the corporation. Now, that concept comes from the inter pari delectro doctrine, but what Mr. Katzman missed was that Mr. Bellow is the sole actor. He's the sole owner of the corporation, and therefore, without regard to acting adverse to the corporation, everything he says is imputed to the corporation under inter pari delectro law. I think the other thing I might want to point out is, let's talk about the argument that this is fundamentally unfair, and that as a result, and he argued this in his papers. This is just unfair. You've got to allocate the risk somewhere. It's unfair to the creditors of Wall Design. They're in zero position to determine to whom Wall Design writes checks. The person who gets the checks is 100% knowledgeable of which checks he or she gets. Number two, Mr. Katzman took the position in his papers that this just lets Mr. Bellow off scot-free, but he acknowledges we've sued Mr. Bellow. When Mr. Bellow took Wall Design's money, as he was entitled to do as an officer, and paid bills, whether they were personal bills or whatever, with that money, he is a person for whose benefit those transfers were made, and he is liable for those transfers, and he has also breached his fiduciary duties to his company. And when the company is insolvent, it does make a difference, because then the creditors have that claim. And those are claims that the trustee has brought on their behalf against them. I think that covers it. Thank you very much, Your Honor. First, look at the Sixth Circuit case of First Independence Capital Corp. And it says, an individual's use of corporate checks would not lead a reasonable person to believe that the transfers were avoidable, where there was a range of legitimate scenarios in which individuals were entitled to funds from the business for their own personal use. Including salary, repayment of loan officer debt, shareholder distribution. Under the liquidating trust theory, if someone gets a watch for their retirement, they have to wonder and question, where did that watch come from? If I buy my fellow lawyer a lunch, the vendor has to wonder, what's the purpose of that money? That's not the standard for determining good faith, nor should it. And it would be rendered ludicrous. But none of this really matters, because who is in the best, in evaluating all the factors that the liquidating trust was bringing up, in terms of whether there was dominion with Mr. Bellow, or whether there was dominion with Mr. Waldron, who was the best, who was in the best position to do that? The trier of fact, the bankruptcy court. And the bankruptcy court ruled, and it shouldn't be for this court to second guess those findings. Not only that, everything that this court has just said makes complete sense. Their position puts form over substance. Ms. Bellow was in a position to monitor this information, and my clients are innocent holders in due course. I see my time has elapsed. Absent any questions, I'll submit. No questions. Thank you very much. All right. These matters are submitted, and I'll state the case numbers for the record. That's 15-56221 and also 15-56220. Thank you, both sides, for your arguments.
judges: Tashima, Nguyen, Marbley